UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW MEXICO

In re:
RODOLFO LOVATO and
LISA LOVATO,
    Debtors.                                                No. 7-07-10287 SA

ALBERT SANCHEZ,
    Plaintiff,
v.                                                             Adv. No. 07-1072 S
RODOLFO LOVATO and
LISA LOVATO,
    Defendants.

## MEMORANDUM OPINION IN SUPPORT OF JUDGMENT OF LIABILITY AGAINST RODOLFO LOVATO AND ORDER FOR SUPPLEMENTAL HEARING ON DAMAGES

The complaint of Plaintiff Albert Sanchez ("Sanchez") against Defendants Rodolfo Lovato ("Lovato") and his spouse Lisa Lovato, alleging that they had defrauded him, came before the Court for trial on March 25, 2009. Having considered the evidence, including the testimony of the witnesses, the Court finds that Lovato is liable to Sanchez[1] and the liability is non-dischargeable. The Court further finds that an additional non-evidentiary hearing on damages is appropriate.[2]

---

[1] The Court finds that none of the evidence whatever concerned Lisa Lovato. Since she cannot be held liable for a non-dischargeable debt based merely upon her status as the spouse of Rodolfo Lovato, the complaint against Lisa Lovato will be dismissed with prejudice. E.g., Sandler v. Aguilar (In re Aguilar), slip op., Adv. Proc. 08-1144, doc 10 (Bankr. D.N.M. 2009).

[2] The Court has jurisdiction of the subject matter and the parties pursuant to 28 U.S.C. §§ 1334 and 157; this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I); and these are findings of fact and conclusions of law as may be required by F.R.B.P. 7052.

**Background**

In 2001, Sanchez wanted to substantially renovate his ancestral home located near Five Points in Albuquerque, New Mexico. He initially contacted a well known builder, Homes by Maria, whose unwritten bid was about $250,000. Taken aback by the large number, Sanchez sought out other builders. A relative recommended Tomas Torres ("Torres"), who obtained the services of Robert Puckett, a construction draftsman with a GB98 (general contractor) license, to prepare a bid for the project. Together the two of them came up with a bid of $104,000, which Sanchez found far more palatable.[3] Torres did not have a contractor's license himself, which was a problem for several reasons, one of which was that as the contract builder he would not be able to pull a building permit due to the lack of a license. Neither Torres nor Puckett disclosed to Sanchez this fact. Torres nevertheless pulled a building permit by falsely claiming (to the extent he had to provide any explanation at all) to Bernalillo County that he was pulling it for Universal Builders, Lovato's business. Lovato was the qualifying party for Universal Builders, with a fistful of licenses including a GB98. Torres

---

[3] Subsequent change orders increased the price to $142,000, with Sanchez receiving a credit of $10,000 for cabinets that he was to supply to the project. As it happened, the $142,000 was only the beginning of the costs. The Court need not go into the numbers in detail at this stage; those numbers will be the focus of the supplemental argument.

Case 07-01072-s    Doc 39    Filed 10/15/09    Entered 10/15/09 15:34:35 Page 2 of 9

had worked with Universal and Lovato before, so much so that he was able to pull the permit in the name of Universal with few if any questions asked by County personnel issuing the permit. When or even whether Torres told Lovato about pulling the permit under Universal's name is at the heart of this dispute.

Under Torres, working with Puckett's plans and change orders, the project was a disaster. Torres testified that when they removed the roof, the house fell down. As the months passed, the construction of the exterior of the house progressed while the interior remained almost entirely unreconstructed. What work was done, such as the roof support, was completely inadequate and risked catastrophic failure. The whole situation would serve as script material for a low-grade Hollywood comedy were it not for the grievous consequences to almost everyone involved.

Sanchez and Torres entered into a short series of change orders to address the steadily increasing expenses of the project, until finally Sanchez announced that there would be no additional funds delivered to Torres for the project. Thereupon work rapidly slowed and had stopped by late fall of 2002. In January 2003 Lovato appeared on the site, surveyed the project and began doing some of the electrical work. In March he sent a letter to Sanchez offering to complete the project for $77,000. Sanchez refused. Ultimately Sanchez obtained the services of SLT

Construction Company to complete the project, paid off a series of subcontractor liens, and paid other bills, for a total construction cost substantially exceeding the bid from Homes by Maria.

Sanchez then commenced legal actions against Lovato, among others; Lovato did not respond to the complaint and Sanchez obtained a default judgment against him. Lovato then filed his chapter 7 case on February 8, 2007, and this adversary proceeding ensued.[4]

**Liability**

Section 523(a)(2)(A) of the Bankruptcy Code provides as follows:

---

[4] Federal Courts in New Mexico must give the same preclusive effect to a judgment as would a New Mexico court. Fowler Brothers v. Young (In re Young), 91 F.3d 1367, 1374 (10th Cir. 1996). See also Corzin v. Fordu (In re Fordu), 201 F.3d 693, 703 (6th Cir. 1999):
> When a federal court is asked to give preclusive effect to a state court judgment, the federal court must apply the law of the state in which the prior judgment was rendered in determining whether and to what extent the prior judgment should be given preclusive effect in a federal action. (Citations omitted.)

Therefore, this Court should look at the preclusive effect that the New Mexico state court would give to the default judgment.

Under New Mexico law, to invoke collateral estoppel a party must establish four elements: 1) same parties or privity, 2) subject matter of the two suits are different, 3) the ultimate facts or issues were actually litigated, and 4) the issue was necessarily determined. Reeves v, Wimberly, 107 N.M. 231, 233, 755 P.2d 75, 77 (Ct. App. 1988). In this case, the matter at issue was clearly not actually litigated and not necessarily determined in the state court action. In consequence, the matter needed to be tried on the merits in this court.

> § 523. Exceptions to discharge
> (a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt--
> ...
>> (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by--
>>> (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;....

To recover under this subsection, a plaintiff must show "[t]he debtor made a false representation; the debtor made the representation with the intent to deceive the creditor; the creditor relied on the representation; the creditor's reliance was reasonable; and the debtor's representation caused the creditor to sustain a loss." Fowler Bros. v. Young (In re Young), 91 F.3d 1367, 1373 (10th Cir. 1996). Actually, the creditor's reliance need only have been justifiable. Field v. Mans, 516 U.S. 59, 74-75 (1995).

The central dispute concerning Lovato's liability in this adversary proceeding is the memorable Watergate question: what did he know and when did he know it? The Court easily concludes that Lovato knew within three to four days that Torres had pulled the building permit in the name of Universal Builders, but did not inform Sanchez of that fact. Torres conceded that he did not tell Lovato about pulling the permit before or when he did it; the Court finds however that Torres did tell Lovato within about three days of doing it. The Court believes Torres was truthful

Case 07-01072-s    Doc 39    Filed 10/15/09    Entered 10/15/09 15:34:35 Page 5 of 9

and accurate on this point.  Torres' statement is not contrary to the affidavit, Lovato exhibit 14, that he signed in the office of Lovato's bankruptcy attorney with the aid of Lovato.  Paragraph 5 of the affidavit states only that "Rodolfo Lovato did not have knowledge that [Torres] had purchased the permit, and did not authorize [Torres] to do so."  Lovato exhibit 14.  This statement is entirely consistent with Torres' statements that initially he did not tell Lovato what he was doing, and with Torres' repeated expressions of remorse.  And it is not inconsistent with Torres testifying that he told Lovato a few days later.  The Court also finds that Torres likely does not have the capability to make up a whole false story about Lovato's liability, even if he was so inclined to do so at this stage.  And the Court is somewhat skeptical of Lovato's professed motive for showing up on the site and continuing the work; to wit, Torres had been honest with him (Lovato) and so Lovato was willing to help Torres fix the problem, and Lovato never left a job unfinished.[5]

What seals the inquiry, however, is Sanchez exhibit 5, the March 18, 2003 letter from Lovato to Sanchez.  The letter tells Sanchez that Lovato and Torres are essentially judgment proof, the problem is that the project was way underbid, and that Lovato can fix the problem for about $77,000.  Nowhere in the letter

---

[5] Lovato's statement suggests he may have considered this job to be "his", an implication that further supports Lovato's liability.

does Lovato does claim that he never knew about the permit being pulled in Universal's name. Rather, the second paragraph of the letter concedes that "I am the qualifying party and company owner for the licensing and permitting involved...."

Neither Torres nor Lovato (nor, for that matter, Puckett) ever told Sanchez that Torres was not licensed as a contractor. Lovato's silence constituted a form of intentional deception.[6]

> Actionable fraud is found if a party to a transaction knows of material facts, has a duty to disclose, and remains silent. A duty to disclose may arise if there is knowledge that the other party to a contemplated transaction is acting under a mistaken belief....

Krupiak v. Payton, 90 N.M. 252, 253, 561 P.2d 1345, 1346 (1977), citing, among other authorities, Everett v. Gilliland, 47 N.M. 269, 141 P.2d 326 (1943). Lovato's intent to induce Sanchez to contract with Torres (or keep the contract in place), based on Torres' misrepresentation to Sanchez and Lovato not correcting that, is sufficient to support that part of the fraud claim.

Sanchez testified that had he known Torres was not licensed, he would never have contracted with Torres. Given Sanchez' accepting a ridiculously low figure for the construction (about $40 per square foot), the Court wonders whether Sanchez in fact would have been put off by the lack of a contractor's license. He certainly did not ask to see such a license, nor, as is

---

[6] None of this is to suggest that Lovato was acting malevolently, but only that it appears he thought Torres was up to the job and in effect consented to Torres using his license.

apparent by the fact of this litigation, did he insist that Torres be bonded for the project.  Nevertheless, the Court finds it more likely than not that Sanchez would have insisted on a licensed contractor had the issue been brought up.  This was Sanchez' testimony (rendered of course after consulting with attorneys), and no one at the trial disputed it.  And given Sanchez' almost complete naivete about the cost and process of residential reconstruction on a such a large scale (including, in this case, literally raising the roof), coupled with the assurances provided by Puckett to Sanchez, Sanchez' reliance was justifiable.

**Damages**

Sanchez presented several elements to go into an aggregate damages award starting at over $384,000.  Obviously as an unlicensed contractor Torres is not able to retain any of the payments made to him, e.g., Gamboa v. Urena, 135 N.M. 515, 90 P.3d 534 (Ct. App.), cert. denied 2004, citing NMSA 1978, §§ 60-13-1 to -59, the Construction Industries Licensing Act ("CILA"), even if Sanchez had known about the lack of the license.  135 N.M. at 519, 90 P.3d at 538, citing Mascarenas v. Jaramillo, 111 N.M. 410, 414, 806 P.2d 59, 63 (1991).  One question is whether Lovato, who received nothing from the funds paid to Torres, should be liable for the amounts paid to Torres.  And since Lovato himself was licensed, should the ban on the application of

the unjust enrichment doctrine required by CILA, <u>Gamboa v. Urena</u>, 135 N.M. at 518, 90 P.3d at 537, be applicable to him in such a way that he should also be liable to Sanchez for the amounts paid to SLT Construction Company.  These are two questions that the Court needs to address with the parties before making a final decision in this matter.[7]  The Court will therefore notice a supplemental non-evidentiary hearing on the additional damages issues, and render judgment thereafter.

_____
James S. Starzynski
United States Bankruptcy Judge

Date Entered on Docket:  October 15, 2009

COPY TO:

Lisa Lovato
06 Calle Granada
Los Lunas, NM 87031

Rodolfo Lovato
05 Calle Sandia
Los Lunas, NM 87031

Jason Neal
320 Gold Avenue SW, Suite 900
Post Office Box 8
Albuquerque, NM 87103-0008

Chris W. Pierce
PO Box 30088
Albuquerque, NM 87190-0088

---

[7] The Court also finds that it need not determine, at this point, whether Lovato is also liable to Sanchez on the basis of §§ 523(a)(4) and (6).